IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 12-cv-02257-REB-KLM

DEAN CARBAJAL,

      Plaintiff,

v.

ST. ANTHONY CENTRAL HOSPITAL, a corporation,
CENTURA HEALTH, a corporation,
STEPHAN M. SWAN, Physician Assistant, in his official and individual capacities,
GREGORY J. ENGLUND, Registered Nurse, in his official and individual capacities,
MARCI L. HANSUE, Registered Nurse, in her official and individual capacities,
MICHAEL O'NEILL, Police Officer for the Denver Police Department, in his official and individual capacities,
JAY LOPEZ, Police Officer for the Denver Police Department, in his official and individual capacities,
LARRY BLACK, Police Officer for the Denver Police Department, in his official and individual capacities, and
APEX, a corporation,

      Defendants.

_____

## RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE
_____

**ENTERED BY MAGISTRATE JUDGE KRISTEN L. MIX**

This matter is before the Court on the **Partial Motion for Summary Judgment** [#239],[1] filed by Defendants Michael O'Neill ("O'Neill"), Jay Lopez ("Lopez"), and Larry Black ("Black") (collectively, the "Denver Defendants"); on the **Motion for Summary Judgment** [#241], filed by Defendants Stephen Swan, P.A. ("Swan") and Apex; and on the **Motion for Summary Judgment** [#243], filed by St. Anthony Central Hospital ("St.

_____

[1] "[#239]" is an example of the convention the Court uses to identify the docket number assigned to a specific paper by the Court's case management and electronic case filing system (CM/ECF).  This convention is used throughout this Recommendation.

Anthony"), Centura Health ("Centura"), Gregory J. Englund ("Englund"), and Marci L. Hansue ("Hansue") (collectively, the "St. Anthony Defendants"). Plaintiff, who proceeds in this matter as a pro se litigant,[2] filed Responses [#272, #273, and #276] in opposition to the Motions,[3] and Defendants filed Replies [#294, #296, #297]. The Motions have been referred to the undersigned for recommendation [#245] pursuant to 28 U.S.C. § 636(b) and D.C.COLO.LCivR 72.1(c). The Court has reviewed the Motions, Responses, Replies, the entire case file, and the applicable law, and is sufficiently advised in the premises. For the reasons set forth below, the Court respectfully **RECOMMENDS** that the Denver Defendants' Motion [#239] be **GRANTED in part and DENIED in part**, that Defendants Swan and Apex's Motion [#241] be **GRANTED**, and that the St. Anthony Defendants' Motion [#243] be **GRANTED**.

## I. Summary of the Case

At the outset, the Court notes that, although the parties agree on the broad outline of events underlying this lawsuit, the details are hotly contested.[4] Plaintiff was arrested on

---

[2] The Court must construe the filings of a pro se litigant liberally. *See Haines v. Kerner*, 404 U.S. 519, 520-21 (1972); *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991). However, the Court should not be the pro se litigant's advocate, nor should the Court "supply additional factual allegations to round out [the pro se litigant's] complaint or construct a legal theory on [his] behalf." *Whitney v. New Mexico*, 113 F.3d 1170, 1173-74 (10th Cir. 1997) (citing *Hall*, 935 F.2d at 1110). In addition, pro se litigants must follow the same procedural rules that govern other litigants. *Nielson v. Price*, 17 F.3d 1276, 1277 (10th Cir. 1994).

[3] Plaintiff also filed Amended Responses [#289, #290, #292] on January 9, 2015, long after the original deadline for filing Responses and only a few days before Defendants' deadline to file Replies. Because the Amended Responses were untimely, because Plaintiff did not seek leave to file them, because it is unclear to what extent they differ from the original Responses, and because Defendants did not consider them in their Replies, the Court does not consider them for purposes of resolving the present dispositive motions. However, the Court has examined Plaintiff's amended exhibits. *See Minute Order* [#295, #308].

[4] The following summary construes the evidence in the light most favorable to Plaintiff, as the nonmovant. *Ellis v. J.R.'s Country Stores, Inc.*, __ F.3d __, __, 2015 WL 1004715 (10th Cir. Mar. 9, 2015) ("We . . . recit[e] all summary-judgment evidence in the light most favorable to . . . the

August 28, 2010.  *Depo. of Pl.* [#274-2] at 11; *Ex. 3, Arrest Report of Jay Lopez* [#239-3] at 1.  After his arrest, he was transported by ambulance to St. Anthony Central Hospital.  *Depo. of Pl.* [#274-2] at 10-13; *Aff. of O'Neill* [#239-4] ¶ 7.  On his arrival at the hospital and multiple times thereafter, Plaintiff asked to speak with "internal affairs."[5]  *Depo. of Pl.* [#274-2] at 55.  Plaintiff was subjected to a number of medical tests, including a forced catheterization.  *Id.* at 55, 81.  Defendant Swan (a Physician Assistant employed by Defendant Apex, *Aff. of Swan* [#241-3] ¶ 2) ordered a urine sample, Defendant Englund (a Registered Nurse employed by Defendant St. Anthony, *Aff. of Englund* [#241-3] ¶¶ 2-3), performed the catheterization, and law enforcement personnel helped to restrain Plaintiff during the procedure.[6]  *Depo. of Pl.* [#274-2] at 79-81; *Aff. of Englund* [#239-6] ¶¶ 5-6, 8.  Although Defendant Black also requested a urine sample, *Depo. of Pl.* [#274-2] at 79, Defendant Swan's decision to order the urine catheterization was an independent medical decision based on his determination that it was medically necessary for the care and treatment of Plaintiff before he could be medically discharged from the emergency department of the hospital to the custody of the police for transportation to jail.[7]  *Aff. of*

---

nonmovant.").

[5]  It has been woefully unclear throughout this litigation exactly to whom Plaintiff wanted to speak when he repeatedly asked to speak to "internal affairs."  The summary judgment evidence does little to clarify this issue.  However, one piece of documentary evidence mentions "internal affairs."  *Denver Police Dep't Inter-Dep't Correspondence* [#239-3] (providing an arrest report written by Defendant Lopez and sent to "Internal Affairs Bureau").  Examining this scintilla of evidence in the light most favorable to Plaintiff, as the nonmovant, *see Ellis*, 2015 WL 1004715, the Court construes Plaintiff's request to speak to someone from internal affairs to refer to the Internal Affairs Bureau of the Denver Police Department.

[6]  There is contradictory evidence about which of the Denver Defendants were present and helped to restrain Plaintiff, which the Court discusses below.  However, it is undisputed that at least some of the Denver Defendants participated in restraining Plaintiff.

[7]  Plaintiff vigorously contests this fact but has provided no non-speculative, non-conclusory evidence to oppose it.  *See, e.g.*, *Pl.'s Decl. & Verified Response to Defs.' Statement of Material*

*Swan* [#241-3] ¶¶ 5-9.  The analysis of Plaintiff's urine showed positive results for alcohol and cocaine.[8]  *Pl.'s Medical Records* [#244] at 18.  These results were never used against Plaintiff in any criminal prosecution.  *Pl.'s Response to Denver Defs.' Interrogatories to Pl.* [#239-9] at 10.[9]

The following claims remain in this action: (1) unreasonable search and seizure in violation of the Fourth Amendment against Defendants Lopez, O'Neill, Black, Englund, and Swan; (2) excessive force in violation of the Fourth Amendment against Defendants Lopez, O'Neill, Black, Englund, and Swan; (3) negligence against Defendants Swan, Englund, St. Anthony, and Centura; (4) retaliation in violation of the First Amendment against Defendants Lopez, O'Neill, Black, Englund, and Swan; (5) invasion of privacy in violation of the Fourth Amendment against Defendants Lopez, O'Neill, Black, Englund, and Swan; (6) extreme and outrageous conduct against Defendants St. Anthony, Centura, Apex, Swan, Englund, and Hansue; and (7) conspiracy to violate Plaintiff's civil rights in violation of the First and Fourth Amendments against Defendants Lopez, O'Neill, Black, Englund, and Swan.  *Order* [#133] at 19 n.9.

## II.  Standard of Review

---

*Facts* [#274-1] at 17 ("The Defendants Swan, Englund, and Hanshue each conspired to forcefully catheterize Mr. Carbajal for a non-medical reason . . . .").  In other words, Plaintiff has not provided competent evidence demonstrating that the procedure was not medically necessary.

[8]  Plaintiff admits that he consumed some alcohol that night, but he denies having ingested cocaine.  *Depo. of Pl.* [#274-2] at 71, 93-94.  Although he argues that the test was "inaccurate" or "false" or "unreliable", *id.* at 94, he has provided no evidence to support his conclusion.  *See Scott,* 550 U.S. at 380; *Bones,* 166 F.3d at 875; *see also Pl.'s Decl. & Verified Response to Defs.' Statement of Material Facts* [#274-1] at 17 ("[N]o reliable test was ever performed on the blood or urine[;] these test[s] were presumptive tests that were never confirmed; thus, it can not be said that Mr. Carbajal had internally possessed an illegal substance . . . .").

[9]  The Court discusses the remainder of the relevant facts in connection with its analysis of Plaintiff's claims below.

The purpose of a motion for summary judgment pursuant to Fed. R. Civ. P. 56 is to assess whether trial is necessary. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). An issue is genuine if the evidence is such that a reasonable jury could resolve the issue in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is material if it might affect the outcome of the case under the governing substantive law. *Id.*

The burden is on the movant to show the absence of a genuine issue of material fact. *Adler v. Wal–Mart Stores, Inc.*, 144 F.3d 664, 670-71 (10th Cir. 1998) (citing *Celotex*, 477 U.S. at 323). When the movant does not bear the ultimate burden of persuasion at trial, the "movant may make its prima facie demonstration [of the absence of a genuine issue of material fact] simply by pointing out to the [C]ourt a lack of evidence for the nonmovant on an essential element of the nonmovant's claim." *Id.* at 671. If the movant carries the initial burden of making a prima facie showing of a lack of evidence, the burden shifts to the nonmovant to put forth sufficient evidence for each essential element of his claim such that a reasonable jury could find in his favor. *See Anderson*, 477 U.S. at 248; *Simms v. Okla. ex rel. Dep't of Mental Health & Substance Abuse Servs.*, 165 F.3d 1321, 1326 (10th Cir. 1999), abrogation recognized by *Eisenhour v. Weber County*, 744 F.3d 1220, 1227 (10th Cir. 2014). Conclusory statements based merely on conjecture, speculation, or subjective belief are not competent summary judgment evidence. *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004). The nonmoving party's evidence must be more than "mere reargument of [his] case or a denial of an opponent's allegation" or it will be disregarded. *See* 10B Charles Alan Wright, et al., Federal Practice and Procedure § 2738 at 356 (3d ed. 1998).

Only documents that adhere to the evidentiary requirements of Fed. R. Civ. P. 56

may be considered for purposes of summary judgment.  Rule 56(c) provides that:

> (1) A party asserting that a fact cannot be or is genuinely disputed must
> support the assertion by:
>> (A) citing to particular parts of materials in the record, including
>> depositions, documents, electronically stored information, affidavits or
>> declarations, stipulations (including those made for purposes of the
>> motion only), admissions, interrogatory answers, or other materials[.]
>> ...
> (3) Materials Not Cited. The court need consider only the cited materials, but
> it may consider other materials in the record.
> (4) Affidavits or Declarations. An affidavit or declaration used to support or
> oppose a motion must be made on personal knowledge, set out facts that
> would be admissible in evidence, and show that the affiant or declarant is
> competent to testify on the matters stated.

Fed. R. Civ. P. 56(c)(1)-(4).

## III.  Analysis

### A.  Applicability of *Scott v. Harris*

At the outset, the Court addresses Defendants' general argument regarding

Plaintiff's proffered evidence, which includes his own sworn statements.  Defendants argue:

> Plaintiff's self-serving statements, which are highly implausible on their face
> and squarely contradicted by the record at large, are not sufficient to create
> a genuine issue of material fact. . . .  Plaintiff's allegations are corroborated
> solely by his own testimony and are contradicted by the overwhelming weight
> of the record—including the records maintained by both the medical and non-
> medical Defendants as well as every witness to the events underlying this
> suit apart from Plaintiff himself.

*Reply* [#296] at 2-3.  In support, Defendants cite to *Scott v. Harris*, 550 U.S. 372, 380

(2007), for the proposition that "[w]hen opposing parties tell two different stories, one of

which is blatantly contradicted by the record, so that no reasonable jury could believe it, a

court should not adopt that version of the facts for purposes of ruling on a motion for

summary judgment."  *Reply* [#296] at 2.

The Tenth Circuit Court of Appeals has addressed the contours of *Scott* many times. In *Tellez v. City of Belen*, 560 F. App'x 812, 815 (10th Cir. 2014), the court found that *Scott* applied because "the video and photographic evidence blatantly contradict[ed] the statements of [Plaintiff's witnesses] that [the deceased] did not have a gun, and the other neighbors' statements are consistent with that evidence." In *Joint Technology, Inc. v. Weaver*, 567 F. App'x 585, 588 n.3 (10th Cir. 2014), the court found that *Scott* applied to an affidavit that was "largely uncorroborated, conclusory, and contradicted, in parts, by a two-hour recording of a conference call . . . ." In *Pierson v. Bassett*, 534 F. App'x 768, 771 (10th Cir. 2013), the court found that *Scott* applied when "[n]o rational trier of fact could believe plaintiff's characterization of his own behavior as compliant and never argumentative after hearing the audiotapes [that plaintiff made of the encounter on his cell phone]."

*Scott*, *Tellez*, *Weaver*, and *Pierson* are distinguishable because in this case there is no video or audio recording of the underlying events. The instant case most closely parallels the Tenth Circuit's decision in *Rhoads v. Miller*, 352 F. App'x 289, 291 (10th Cir. 2009), in which the Tenth Circuit rejected the application of *Scott*:

> In evaluating a motion for summary judgment based on qualified immunity, we take the facts "in the light most favorable to the party asserting the injury." *Scott v. Harris*, 550 U.S. 372, 377 (2007). "[T]his usually means adopting . . . the plaintiff's version of the facts," *id.* at 378, unless that version "is so utterly discredited by the record that no reasonable jury could have believed him," *id.* at 380. In *Scott*, the plaintiff's testimony was discredited by a videotape that completely contradicted his version of the events. 550 U.S. at 379. Here, there is no videotape or similar evidence in the record to blatantly contradict Mr. Rhoads' testimony. There is only other witnesses' testimony to oppose his version of the facts, and our judicial system leaves credibility determinations to the jury. And given the undisputed fact of injury, Mr. Rhoads' alcoholism and memory problems go to the weight of his testimony, not its admissibility.

> Mr. Rhoads alleges that his injuries resulted from a beating rendered without resistance or provocation.  If believed by the jury, the events he describes are sufficient to support a claim of violation of clearly established law under *Graham v. Connor*, 490 U.S. 386, 395-96 (1989), and this court's precedent.  The jurors may decide not to credit Mr. Rhoads' testimony, but that is their prerogative, not ours.  Therefore, the district court did not err in denying Deputy Miller's motion for summary judgment based on qualified immunity.

*Id.* at 291-92 (internal citations and footnotes omitted).

On a motion for summary judgment, the Court need not consider conclusory statements made by Plaintiff that are "based merely on conjecture, speculation, or subjective belief" and for which there is no other evidentiary support.  *Scott*, 550 U.S. at 380; *Bones*, 166 F.3d at 875.  However, even excluding these statements, there are, quite simply, two versions of the events at issue in this lawsuit—Defendants' version and Plaintiff's version—and each is supported by an affidavit or other evidence.  While the weight of the evidence may tend to support one version, the fact that there is conflicting evidence creates a question of credibility which should be resolved by the fact finder, to the extent determined necessary below.  *See, e.g.*, *Klein v. Grynberg*, 44 F .3d 1497, 1503-04 (10th Cir. 1995); 10A Charles Alan Wright et al., Federal Practice and Procedure § 2726 at 443-48 (3d ed. 1998).  Thus, insofar as Defendants assert that summary judgment is appropriate because the weight of the evidence rests in their favor, "[s]ummary judgment concerns the sufficiency of the evidence to present an issue for trial, not the weight of such evidence."  *Carey v. USPS*, 812 F.2d 621, 623 (10th Cir. 1987); *United States v. Hager*, 969 F.2d 883, 888 (10th Cir. 1992) ("The credibility of a witness and weight of his testimony are for the trier of fact alone."), *abrogated on other grounds by Bailey v. United States*, 516 U.S. 137 (1995); *see also United States v. Great Salt Lake Council, Inc.*, No. 2:04-CV-604 TC, 2007 WL 189470, at *3 (D. Utah Jan. 22, 2007) (noting that a "single sworn statement

is sufficient to create an issue of fact precluding summary judgment" (citation omitted)).

Accordingly, the Court proceeds to evaluate the merits of Plaintiff's claims.

**B.    The Medical Defendants' Motions for Summary Judgment**

**1.    Constitutional Claims**

Defendants Swan and Englund argue that they were not state actors and therefore that Plaintiff's constitutional claims (unreasonable search and seizure, excessive force, retaliation, invasion of privacy, and conspiracy) against them fail.[10] Here, the evidence shows that Defendant Swan independently requested a urine sample from Plaintiff even while a urine sample was simultaneously requested by Defendant Black.  Thus, both the Medical Defendants and the Denver Defendants were interested in obtaining a urine sample from Plaintiff.  "The question is whether the marriage of convenience resulted in a constitutional violation" by the private actors.  *Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*, 757 F.3d 1125, 1145 (10th Cir. 2014).

Section 1983 provides, in part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

"To state a claim for relief in an action brought under § 1983, [Plaintiff] must establish not only the deprivation of a right secured by the Constitution or laws of the United States, but also a deprivation committed under color of state law."  *Brokers' Choice of Am., Inc.*, 757 F.3d at 1143 (citing *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49-50 (1999)).  "[T]he

---

[10]  There are no remaining constitutional claims against the other Medical Defendants, i.e., St. Anthony's, Centura, and Apex.  *Order* [#133] at 19 n.9.

purpose of § 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails." *Wyatt v. Cole*, 504 U.S. 158, 161 (1992). "Like the state-action requirement of the Fourteenth Amendment, the under-color-of-state-law element of § 1983 excludes from its reach merely private conduct, no matter how discriminatory or wrongful." *Brokers' Choice of Am., Inc.*, 757 F.3d at 1143 (quoting *Am. Mfrs. Mut. Ins. Co.*, 526 U.S. at 50). "[S]tate action may be found if, though only if, there is such a close nexus between the State and the challenged action that seemingly private behavior may be fairly treated as that of the State itself." *Brokers' Choice of Am., Inc.*, 757 F.3d at 1143 (quoting *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001)). "The purpose of this requirement is to assure that constitutional standards are invoked only when it can be said that the State is responsible for the specific conduct of which the plaintiff complains." *Brokers' Choice of Am., Inc.*, 757 F.3d at 1143 (quoting *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982)). Thus, the only proper defendants in a § 1983 action are those who "represent [the state] in some capacity, whether they act in accordance with their authority or misuse it." *Monroe v. Pape*, 365 U.S. 167, 172 (1961); *Gallagher v. "Neil Young Freedom Concert"*, 49 F.3d 1441, 1447 (10th Cir.1995).

Four tests are used to determine whether a private individual or entity may be found to be acting under color of state law and, therefore, may be liable pursuant to § 1983. *See Gallagher*, 49 F.3d at 1447. In short, these tests are the nexus test, the symbiotic-relationship test, the joint-activity test, and the public-functions test. *See id.* The nexus tests requires the Court to consider "whether there is a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself." *Id.* (quoting *Jackson v. Metropolitan*

*Edison Co.*, 419 U.S. 345, 351 (1974)).  The symbiotic-relationship test asks whether the state and the private party have "so far insinuated [themselves] into a position of interdependence" that a symbiotic relationship has formed.  *Id.* (citing *Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 175 (1972); quoting *Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 725 (1961)).  The joint-activity test inquires whether the private party is "a willful participant in joint activity with the State or its agents."  *Id.* (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 152 (1970)).  The public-function test determines whether the private entity has exercised "powers traditionally reserved to the State."  *Id.* (quoting *Jackson*, 419 U.S. at 352).  In short, pursuant to each test, a plaintiff must show that "the alleged deprivation of constitutional rights was 'caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for whom the State is responsible.'"  *Id.* (quoting *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 935 (1982)).

The circumstances in this case fall far short of meeting the requirements of the nexus test, the symbiotic-relationship test, or the public-function test.  Plaintiff has not asserted that "there is a sufficiently close nexus between the State and the challenged action of [the medical personnel] so that the action of the latter may be fairly treated as that of the State itself."  *Jackson*, 419 U .S. at 351.  Nor has Plaintiff  asserted that the State and Defendants Swan and Englund "so far insinuated [themselves] into a position of interdependence" that a symbiotic relationship formed.  *Moose Lodge No. 107*, 407 U.S. at 175; *Burton*, 365 U.S. at 725.  Finally, Plaintiff does not assert that Defendants Swan and Englund exercised "powers traditionally reserved to the State."  *Jackson*, 419 U.S. at 352.  The Third Circuit has noted that "the traditionally exclusive public function requirement is a rigorous standard that is rarely . . . satisfied."  *Leshko v. Servis*, 423 F.3d 337, 347 (3d

Cir. 2005).

To the contrary, however, Plaintiff attempts to demonstrate that Defendants Swan and Englund were each a "willful participant in joint activity with the State or its agents." *Adickes*, 398 U.S. at 152. In *Adickes v. S.H. Kress & Co.*, the United States Supreme Court held that, "[a]lthough this is a lawsuit against a private party, not the State or one of its officials, our cases make clear that petitioner will have made out a violation of her Fourteenth Amendment rights and will be entitled to relief under § 1983 if she can prove that a Kress employee, in the course of employment, and a Hattiesburg politician somehow reached an understanding to deny Miss Adickes service in The Kress store, or to cause her subsequent arrest because she was a white person in the company of Negroes." *Id.* The Supreme Court further held that "[t]he involvement of a state official in such a conspiracy plainly provides the state action essential to show a direct violation of petitioner's Fourteenth Amendment equal protection rights, whether or not the actions of the police were officially authorized, or lawful." *Id.*

The Tenth Circuit Court of Appeals has held that the joint-action test may be satisfied by demonstrating that "state officials and private parties have acted in concert in effecting a particular deprivation of constitutional rights." *Wittner v. Banner Health*, 720 F.3d 770, 777 (10th Cir. 2013) (quoting *Gallagher*, 49 F.3d at 1453). In *Wittner v. Banner Health*, the patient-plaintiff was brought by police to a private hospital for a mental health evaluation after he made threats against his former employer. *Wittner*, 720 F.3d at 771. At the hospital, the patient-plaintiff began acting aggressively and was consequently restrained and injected with medication by medical personnel. *Id.* He later brought suit against the medical personnel pursuant to § 1983. *Id.* Like the present case, the *Wittner* plaintiff conceded that the hospital was a private hospital and that the individual medical

defendants were privately-employed medical professionals.  *Id.* at 774.  Unlike the present case, in *Wittner*, "*[n]otably*, plaintiffs did not name the police officer [and/or] the police department . . . as defendants."  *Id.* (emphasis added).  The *Wittner* court held that the plaintiffs' theory regarding joint action failed because the plaintiffs "have not alleged that any state officials conspired with or acted jointly in making the decision to medicate" the patient-plaintiff.  *Id.* at 777.  The court observed that "plaintiffs' theory of state action seems to be one of acquiescence – that by allowing [the hospital] to hold [the patient-plaintiff], the state should be held responsible for [a hospital] doctor's decision to medicate him."  *Id.* However, "[a]ction taken by private entities with the mere approval or acquiescence of the State is not state action."  *Id.* (quoting *Am. Mfrs. Mut. Ins. Co.*, 526 U.S. at 52).  The court therefore determined that the joint action test was not satisfied based on the alleged facts.

The underlying facts of the present case are similar to the extent that state law enforcement personnel brought Plaintiff to a private hospital staffed by private medical personnel, Plaintiff was restrained, and Plaintiff was administered medical care against his will.  However, unlike in *Wittner*, Plaintiff has provided evidence that law enforcement personnel asked Defendants Swan and Englund to take a sample of Plaintiff's urine.  *Depo. of Pl.* [#274-2] at 79; *see Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982) ("[A] State normally can be held responsible for a private decision only when it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed that of the State.").  The question, therefore, is whether this request made Defendants Swan and Englund's subsequent efforts to procure the urine sample "state action."

In *Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*, 757 F.3d at 1144, the Tenth Circuit Court of Appeals addressed the thorny question of whether there is joint action

-13-

between private and public persons when both have the same goal for independent reasons: "We reiterate: state, not private, action is an irreducible minimum in a § 1983 action.  But what constitutes state action?"  The *Brokers' Choice* court first noted that "[q]uite clearly, a search is not private in nature if it has been ordered or requested by a government official."  757 F.3d at 1144 (citing 1 Wayne R. LaFave et al., Search & Seizure § 1.8(b) (5th ed., 2012 update).  The rationale for this rule is that "[a] governmental agent may not avoid constitutional restraints upon his conduct by procuring a private individual to perform a forbidden act for him."  *Brokers' Choice of Am., Inc.*, 757 F.3d at 1144 (quoting *United States v. Jennings*, 653 F.2d 107, 110 (4th Cir. 1981)).  Thus, "[i]f the evidence was not improperly procured by the government, . . . there would be no state action upon which a § 1983 action might be based."  *Brokers' Choice of Am., Inc.*, 757 F.3d at 1144 (citing *Am. Mfrs. Mut. Ins. Co.*, 526 U.S. at 50).  "However, if the evidence was improperly procured by an agent of the police, that fact would sufficiently state a Fourth Amendment violation under § 1983."  *Brokers' Choice of Am., Inc.*, 757 F.3d at 1144 (citing *United States v. Souza*, 223 F.3d 1197, 1202 (10th Cir. 2000) ("[T]he officers twice, within a span of five minutes, attempted to encourage [the UPS agent] to open the package and [the agent] testified that she was influenced by the officers' attempts.")).  Thus, an action by a private individual may be performed under color of state law if a government agent enlisted the aid of a private individual, the private individual had no independent will or reason for engaging in that conduct, and the private individual's actions were influenced by the government agent's encouragement.  *See Souza*, 223 F.3d at 1202 ("While companies such as UPS have legitimate reasons to search packages independent of any motivation to assist police, there is no evidence that in this instance [the UPS agent] had a legitimate, independent motivation to open the package, despite her practice of randomly opening

-14-

packages on other occasions.").

Prior applications of the joint activity test have concluded that "[a] search will also be deemed subject to Fourth Amendment restrictions if it is a joint endeavor." *Brokers' Choice of Am., Inc.*, 757 F.3d at 1144. "[U]nder the 'joint action' test, . . . we ask whether state officials and private parties have acted in concert in effecting a particular deprivation of constitutional rights." *Id.* (quoting *Wittner*, 720 F.3d at 777. "In looking for concerted activity the devil is in the details." *Brokers' Choice of Am., Inc.*, 757 F.3d at 1144. As an example, the Tenth Circuit suggested that "[w]hether [a] landlord was acting at the behest of the police [in entering a privately-rented residence], for his own purpose (to get rid of a pesky tenant or minimize a costly methamphetamine clean-up), or with mixed motives, is a fact intensive inquiry not unlike many others courts must resolve." *Id.* "[A] case-by-case approach is hardly unique within our Fourth Amendment jurisprudence." *Id.* (quoting *Missouri v. McNeely*, 133 S. Ct. 1552, 1564 (2013)). "Numerous police actions are judged based on fact-intensive, totality of the circumstances analyses rather than according to categorical rules, including in situations that are more likely to require police officers to make difficult split-second judgments." *Id.*

The Court uses a "two-step inquiry to determine whether a search by a private individual constitutes state action" under the joint activity test. *Brokers' Choice of Am. Inc.*, 757 F.3d at 1145 (quoting *United States v. Benoit*, 713 F.3d 1, 9 (10th Cir. 2013)). First, the Court asks "whether the government knew of and acquiesced in the private person's intrusive conduct." *Id.* Second, the Court asks "whether the party performing the search intended to assist law enforcement efforts or to further his own ends." *Id.* "Both prongs must be satisfied considering the totality of the circumstances before the seemingly private search may be deemed a government search." *Id.* "[K]nowledge and acquiescence . . .

encompass the requirement that the government agent must also affirmatively encourage, initiate or instigate the private action." *Id.* (quoting *United States v. Smythe*, 84 F.3d 1240, 1243 (10th Cir. 1996)).

The Court begins, as it must, "by identifying the specific conduct of which the plaintiff complains." *Brokers' Choice of Am., Inc.*, 757 F.3d at 1143 (quoting *Am. Mfrs. Mut. Ins. Co.*, 526 U.S. at 51). Plaintiff argues that Defendants Swan and Englund were acting under color of state law when he was forcefully catheterized. The relevant evidence, construed in a light most favorable to Plaintiff, *Ellis v. J.R.'s Country Stores, Inc.*, ___ F.3d ___, ___, 2015 WL 1004715 (10th Cir. Mar. 9, 2015), is as follows. On his arrival at the emergency room, medical personnel conducted a battery of tests on Plaintiff. *Depo. of Pl.* [#274-2] at 54-55. Throughout that time, Plaintiff "repeatedly asked them to speak to their supervisor [and] repeatedly asked them to speak to internal affairs." *Id.* at 55. Plaintiff also asked Defendant Black to speak with internal affairs, and he responded "If you want to talk to internal affairs, we're going to need a urine sample, we're going to need a UA." *Id.* at 77. Defendant Black told Defendant Swan that they needed a urine sample. *Id.* at 79. However, Defendant Swan had independently determined that a "urine catheterization was medically necessary for the care and treatment" of Plaintiff before Plaintiff "could be medically discharged from the emergency department to the custody of the police for transportation to jail."[11] *Aff. of Swan* [#241-3] ¶¶ 5-6. Both medical personnel and law

---

[11] As previously noted, Plaintiff fervently contests this assertion. *See, e.g.*, *Decl. of Pl.* [#274-1] at 17. However, he has provided no evidentiary support to contradict Defendant Swan's sworn statement, but rather merely makes conclusory statements based on conjecture, speculation, and/or his own subjective belief that the treatment was not necessary. *See Scott*, 550 U.S. at 380; *Bones*, 166 F.3d at 875. In addition to his own affidavit [#241-3], Defendant Swan also provides the opinion of an independent medical expert who reviewed the record of Plaintiff's care and treatment on August 28, 2010, and this opinion is in accord with Defendant Swan's determination regarding the need for a urine catheterization. *Aff. of Jobin* [#241-4].

enforcement personnel participated in restraining Plaintiff during the catheterization procedure, which was performed by Defendant Englund at the direction of Defendant Swan. *Depo. of Pl.* [#274-2] at 80-82; *Aff. of Englund* [#239-6] ¶ 8. The results of Plaintiff's urine analysis were positive for cocaine. *Pl.'s Medical Records* [#244] at 18. These results were never used in any criminal prosecution of Plaintiff. *Pl.'s Response to Denver Defs.' Interrogatories to Pl.* [#239-9] at 10.

Returning to the two-part inquiry as to whether there was joint action, the Court first determines "whether the government knew of and acquiesced in the private person's intrusive conduct." *Brokers' Choice of Am., Inc.*, 757 F.3d at 1145. The evidence, viewed in a light most favorable to Plaintiff, supports this element of the inquiry, based on Plaintiff's sworn statements that law enforcement personnel knew of and acquiesced in the search by affirmatively asking Defendant Swan to obtain a urine sample and by helping to restrain Plaintiff during the procedure. *Id.*; *Smythe*, 84 F.3d at 1243 (stating that "the government agent must also affirmatively encourage, initiate or instigate the private action").

Second, the Court determines "whether the party performing the search intended to assist law enforcement efforts or to further his own ends." *Brokers' Choice of Am., Inc.*, 757 F.3d at 1145. The uncontroverted evidence demonstrates that Defendant Swan had independent reasons for seeking a urine sample from Plaintiff, i.e., to gather information in order to provide appropriate care and treatment to Plaintiff. Regardless of whether Defendant Black or other law enforcement personnel asked for a urine analysis to be done, the evidence clearly demonstrates that Defendant Swan would have ordered the toxicology report "to further his own ends." *Id.*; *Aff. of Swan* [#239-5]. In other words, Defendant Swan had ulterior reasons (or perhaps even a duty) to do what he did, and those reasons were independent of the request made by law enforcement. *Cf. Brokers' Choice of Am.,*

*Inc.*, 757 F.3d at 1144 (citing *United States v. Hardin*, 539 F.3d 404, 420 (6th Cir. 2008) ("[B]ecause the officers urged the apartment manager to investigate and enter the apartment, and the manager, independent of his interaction with the officers, had no reason or duty to enter the apartment, we hold that the manager was acting as an agent of the government.")).

The fact that the medical provider independently sought a urine sample from Plaintiff distinguishes this case from other recent cases involving forced catheterizations.   For example, in *Cook v. Olathe Medical Center, Inc.*, 773 F. Supp. 2d 990, 1010 nn. 28, 30 (D. Kan. 2011), "the record [was] silent as to whether [the physician] ordered nurses to forcibly catheterize plaintiff" and "police obtained the urine results for criminal proceedings against plaintiff."  The *Cook* court found that the defendants were not entitled to summary judgment on those facts.  773 F. Supp. 2d at 1012.  In *Hooper v. Pearson*, No. 2:08-CV-871, 2010 WL 2990809, at *4 (D. Utah July 26, 2010), a jail nurse forcibly catheterized the plaintiff pursuant to a bodily fluids search warrant signed by a judge.  Thus, the involvement of the state was clear and, in fact, mandated by the warrant.  Here, there was no bodily fluids warrant, and no other evidence that Defendants Swan and Englund acted pursuant to that type of government instruction.  Further, also unlike *Hooper*, it is clear here that Defendant Swan ordered Defendant Englund to obtain the urine sample, and the results, although positive for cocaine and alcohol, were never used in any criminal proceedings against Plaintiff.  *Pl.'s Response to Denver Defs.' Interrogatories to Pl.* [#239-9] at 10.

Because Plaintiff has provided no competent evidence contradicting Defendants' evidence that the procedure was done to further Plaintiff's medical treatment and would have been completed regardless of the request of Defendant Black, there is no genuine dispute as to any material fact regarding whether the police officers and medical personnel

were engaged in a joint action, and the Medical Defendants are entitled to judgment as a matter of law in that regard. Fed. R. Civ. Pro. 56(a). Accordingly, the Medical Defendants may not be held liable for the alleged violations of Plaintiff's constitutional rights because they were not acting under color of state law when they obtained a sample of Plaintiff's urine. Therefore, the Court **recommends** that judgment enter in favor of Defendants Swan and Englund on Plaintiff's Claim One based on unreasonable search and seizure in violation of the Fourth Amendment; Plaintiff's Claim Two based on excessive force in violation of the Fourteenth Amendment;[12] Plaintiff's Claim Four based on retaliation in violation of the First Amendment; Plaintiff's Claim Five based on invasion of privacy in violation of the Fourth Amendment; and Plaintiff's Claim Seven based on conspiracy in violation of the First, Fourth, and Fourteenth Amendments.

### 2. Negligence

Plaintiff asserts a state law medical negligence claim against Defendants Swan, Englund, St. Anthony's, and Centura based on the allegedly negligent catheterization procedure. *See Order* [#133] at 19 n.9. "Colorado law treats medical malpractice actions as a particular type of negligence action." *Gallardo v. United States*, 752 F.3d 865, 870 (10th Cir. 2014) (quoting *Day v. Johnson*, 255 P.3d 1064, 1068 (Colo. 2011)) (internal quotation marks omitted). The Colorado Court of Appeals recently addressed the issue of negligence claims against medical personnel in the context of a hospital emergency-room setting. *See Settle v. Basinger*, __ P.3d __, 2013 WL 781110 (Colo. App. Feb. 28, 2013). To establish a claim for negligence by medical personnel, a plaintiff must allege the same elements as for any other negligence claim, *i.e.*, that the defendant owed a legal duty to the

---

[12] The Court discusses the appropriate amendment under which Plaintiff's excessive force claim should be analyzed below. *See infra* § III.C.4.

plaintiff, that the defendant breached that duty, and that the breach of duty caused the harm that resulted in the alleged damages. *Id.* at *7 (citing *Gerrity Oil & Gas Corp. v. Magness*, 946 P.2d 913, 929 (Colo. 1997)). *See also Settle*, 2013 WL 781110, at *8 ("Hospitals have a duty to supervise the competence of their medical staffs.") (citing *Braden v. Saint Francis Hosp.*, 714 P.2d 505, 507 (Colo. App. 1985); *Camacho v. Mennonite Bd. of Missions*, 703 P.2d 598, 600 (Colo. App. 1985) (stating that a hospital may be liable for negligently supervising and reviewing the performance of the members of its medical staff)).

Defendants argue that Plaintiff has failed to provide sufficient evidence that they breached any duty of care. In most cases, sufficient proof of this element requires expert opinion testimony:

> To establish a breach of the duty of care in a medical malpractice action, the plaintiff must show that the defendant failed to conform to the standard of care ordinarily possessed and exercised by members of the same school of medicine practiced by the defendant. That standard of care is measured by whether a reasonably careful physician of the same school of medicine as the defendant would have acted in the same manner as did the defendant in treating and caring for the patient. Thus, the standard of care for medical malpractice is an objective one.
>
> Unless the subject matter of a medical malpractice action lies within the ambit of common knowledge or experience of ordinary persons, the plaintiff must establish the controlling standard of care, as well as the defendant's failure to adhere to that standard, by expert opinion testimony. The reason for the requirement of expert opinion testimony in most medical malpractice cases is obvious: matters relating to medical diagnosis and treatment ordinarily involve a level of technical knowledge and skill beyond the realm of lay knowledge and experience. Without expert opinion testimony in such cases, the trier of fact would be left with no standard at all against which to evaluate the defendant's conduct.

*Gallardo*, 752 F.3d at 871 (quoting *Day*, 255 P.3d at 1068, and *Melville v. Southward*, 791 P.2d 383, 387 (Colo. 1990)) (internal citations and quotation marks omitted).

Here, the proper procedure for performing a catheterization on a male patient to

obtain a urine sample is not subject matter that "lies within the ambit of common knowledge or experience of ordinary persons." *See Gallardo*, 752 F.3d at 871. Thus, it is incumbent on Plaintiff to provide expert opinion testimony both to establish the controlling standard of care as well as to establish that the Medical Defendants failed to adhere to that standard. *See id.* However, although Plaintiff has submitted many documentary exhibits to support his assertion that the catheterization process he underwent was negligently performed, he has failed to provide the requisite expert opinion testimony. In light of *Gallardo*'s mandate, as obtained from clear Colorado Supreme Court precedent in *Day v. Johnson* and *Melville v. Southward*, the Court finds that Plaintiff's negligence claim fails for failure to provide sufficient evidence that the Medical Defendants breached a duty of care to him. There is no genuine dispute as to any material fact and Defendants are entitled to judgment as a matter of law. Fed. R. Civ. Pro. 56(a).

Accordingly, the Court **recommends** that summary judgment enter in favor of Defendants Swan, Englund, St. Anthony's, and Centura on this claim.

### 3.   Extreme and Outrageous Conduct

Plaintiff's claim for extreme and outrageous conduct is asserted against all of the Medical Defendants. *Order* [#133] at 19 n.9. To state a claim for outrageous conduct under Colorado law, a plaintiff must allege that (1) the defendant engaged in extreme and outrageous conduct, (2) the defendant did so recklessly or with the intent of causing the plaintiff severe emotional distress, and (3) the conduct did indeed cause the plaintiff severe emotional distress. *Llewellyn v. Shearson Fin. Network, Inc.*, 622 F. Supp. 2d 1062, 1068-69 (D. Colo. 2009) (citing *Green v. Qwest Servs. Corp.*, 155 P.3d 383, 385 (Colo. App. 2006)). A defendant's conduct is outrageous if it is "so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in

a civilized community." *McCrary v. Aurora Pub. Sch.*, 57 F. App'x 362, 374 (10th Cir. 2003) (quoting *Coors Brewing Co. v. Floyd*, 978 P.2d 663, 666 (Colo. 1999)).   To meet the causation element, the plaintiff must provide evidence that the defendant "engaged in outrageous conduct with the specific intent of causing severe emotional distress" or "acted recklessly with the knowledge that there was a substantial probability that [the] conduct would cause severe emotional distress." *Hadley v. Volunteers of Am. Care Facilities*, No. 06-cv-01537-WDM-CBS, 2008 WL 269446, at *4 (D. Colo. Jan. 28, 2008) (quoting *Culpetter v. Pearl St. Bldg., Inc.*, 877 P.2d 877, 882 (Colo. 1994)).   Moreover, "[c]onduct, otherwise permissible, may become extreme and outrageous if it is an abuse by the actor of a position in which he [or she] has actual or apparent authority over the other, or the power to affect the other's interests." *Pearson v. Kancilia*, 70 P.3d 594, 598 (Colo. App. 2003) (citation omitted).   Whether the alleged conduct is sufficiently outrageous is, at least initially, a question of law for the court.   *Green*, 155 P.3d at 385.   Outrageous conduct claims are also known as claims for intentional infliction of emotional distress.   *Llewellyn*, 622 F. Supp. 2d at 1068.

In *Hadley v. Volunteers of America Care Facilities*, 2008 WL 269446, at *4-5, the plaintiff failed to present sufficient evidence in support of an outrageous conduct claim:

> To establish an issue of fact in this regard, Plaintiff proffers an unsigned, undated affidavit by Bonnie Mauldin, a registered nurse, who states that the Defendant's employees "failed to assess, monitor and appropriately respond to Evelyn Hadley's condition and to provide the necessary care and services for Evelyn Hadley to attain or maintain the highest practicable physical, mental, and psychological well-being, in accordance with the comprehensive assessment and plan of care." The affidavit goes on to assert Ms. Mauldin's opinion that the deviations from the standards of care constitute reckless and wanton conduct and a reckless disregard for Mrs. Hadley's health and well being.   Even if this affidavit were proper evidence under Rule 56, it again establishes only negligence, not the elements required to establish outrageous conduct.

(internal citations omitted).

Similarly, in *Reigel v. SavaSeniorCare L.L.C.*, 292 P.3d 977, 991 (Colo. App. 2011), the Colorado Court of Appeals reversed a holding by the trial court that the following evidence was sufficient to support an outrageous conduct claim by a woman whose husband died shortly after being transferred from a nursing facility ("Alpine") to a hospital emergency room: (1) "Alpine employees allegedly refused Ms. Reigel's requests, while she was crying, to send Mr. Reigel to the hospital or have a registered nurse or doctor evaluate him;" (2) "[w]hen Ms. Reigel went to see Ms. Cho about the aforementioned requests, Ms. Cho allegedly said, "in the most caustic voice [Ms. Reigel had] ever heard, [']Well, if it was an emergency, we would call an ambulance;[']" (3) "[t]he Alpine employees responded to Ms. Reigel's requests in a manner that made her feel '[l]ike [she] was going crazy. Like they thought [she] was totally overreacting, like [she] was so upset. Why is she so upset, we're doing all these things, we're doing all these tests, we're waiting for results;'" (4) "[b]etween 2:45 and 4:30 p.m. on the last day Mr. Reigel was at the facility, no nurse or other Alpine employee allegedly checked on Mr. Reigel;" and (5) "Ms. Pemkiewicz allegedly falsified an entry on Mr. Reigel's chart by noting that at 4:30 p.m. his blood pressure was normal. Ms. Reigel testified that neither Ms. Pemkiewicz nor any other Alpine employee was in Mr. Reigel's room at that time. And, when the paramedics took his blood pressure four to five minutes later, it was abnormally low."

The Colorado Court of Appeals found that while there was evidence that Alpine personnel were "abrupt, irresponsible, and lacking in sensitivity in responding to Ms. Reigel's requests for help," the evidence set forth by Ms. Reigel was insufficient to demonstrate outrageous conduct. *Reigel*, 292 P.3d at 991-92 (citing *Humana of Ky., Inc. v. Seitz*, 796 S.W.2d 1, 3-4 (Ky. 1990) (where a nurse delayed in responding to the

plaintiff's room, told her to "shut up" though she was distressed at having given birth to a stillborn baby, and told her that the baby would be disposed of in the hospital, her conduct was not extreme and outrageous; although the nurse's conduct was "cold, callous, and lacking sensitivity," it was not beyond all bounds of decency); *C.M. v. Tomball Reg'l Hosp.*, 961 S.W.2d 236, 244-45 (Tex. App. 1997) (where the defendant treated the plaintiffs "like dirt," told them "[w]e do not like to deal with rape victims," suggested that the alleged victim, a minor, could have lost her virginity by riding a bike or horse, and interviewed the minor in a public waiting room, her "rude, insensitive, and uncaring" conduct was not sufficiently outrageous to present a jury question).

"While the Court has no illusions about the indignity and physical pain that [Plaintiff] endured as a result of this unpleasant procedure," *Lockard v. City of Lawrenceburg, Ind.*, 815 F. Supp. 2d 1034, 1048 (S.D. Ind. 2011), the Court cannot find that the evidence supports a finding that any of the Medical Defendants' actions were "so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *McCrary*, 57 F. App'x at 374. The uncontroverted evidence is that a urine sample was medically necessary to determine what substances were in Plaintiff's system before he could be properly treated and released to law enforcement. Even taking into account Plaintiff's evidence of callous behavior by Defendants Swan and Englund, *see, e.g.*, *Depo. of Pl.* [#274-2] at 78 (testifying that when he told Defendant Swan that he needed to speak to a supervisor, Defendant Swan "just kind of laughed and said, 'I am the supervisor.'"), the Court finds that Plaintiff's evidence is insufficient to meet the elements of a claim for outrageous conduct with respect to any of the Medical Defendants. *See Llewellyn*, 622 F. Supp. 2d at 1068-69. There is no genuine dispute as to any material fact and Defendants are entitled to judgment as a matter

of law.  Fed. R. Civ. Pro. 56(a).

Accordingly, the Court **recommends** that judgment enter in favor of the Medical Defendants on Plaintiff's outrageous conduct claim.

## C.     The Denver Defendants' Motion for Summary Judgment

The remaining claims against the Denver Defendants assert violations of Plaintiff's constitutional rights.  *See Order* [#133] at 19 n.9.  The Denver Defendants assert that they are entitled to qualified immunity on each of these claims.  *Motion* [#239] at 11-12.  A government official sued under § 1983 is entitled to qualified immunity unless it is shown that the official violated a constitutional right that was clearly established at the time of the challenged conduct.  *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2023 (2014) (citing *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2080 (2011)).  "The doctrine of qualified immunity shields government officials performing discretionary functions from liability for damages 'insofar as their conduct does not violate clearly established constitutional rights of which a reasonable person would have known.'"  *Boles v. Neet*, 486 F.3d 1177, 1180 (10th Cir. 2007) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  Qualified immunity also offers protection from trial and other burdens of litigation.  *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).  Because the defense of qualified immunity is raised, the Court considers whether the summary judgment evidence demonstrates that each Denver Defendant violated a constitutional right, and, secondly, whether that constitutional right was clearly established at the time of the alleged violation.  *See Saucier v. Katz*, 533 U.S. 194, 200-01 (2001); *cf. Pearson v. Callahan*, 555 U.S. 223, 242 (2009).  "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity."  *Saucier*, 533 U.S. at 201.  However, the Supreme Court has held that courts are no longer required to address the inquiries in a particular

order when evaluating a qualified immunity claim. *Pearson v. Callahan*, 555 U.S. 223 (2009).

In order for Plaintiff's claims "to survive summary judgment, the record must contain facts that rebut the presumption of [each Denver Defendant's] immunity from suit." *Medina v. Cram*, 252 F.3d 1124, 1130 (10th Cir. 2001); *see Anaya v. Crossroads Managed Care Sys., Inc.*, 195 F.3d 584, 593 (10th Cir. 1999) (denying summary judgment on qualified immunity where the "[t]he record supports the allegation that the plaintiffs' Fourth Amendment rights were violated"); *Bruning v. Pixler*, 949 F.2d 352, 356 (10th Cir. 1991) (noting that when "a government official raises the defense of qualified immunity in a motion for summary judgment, the plaintiff must produce facts sufficient to show both that the defendant's alleged conduct violated the law and that [the] law was clearly established when the alleged violation occurred"); *Rounds v. Corbin*, No. 04-cv-02532, 2009 WL 2982006, at *2-3 (D. Colo. Sept. 11, 2009) (denying qualified immunity on summary judgment because plaintiff "submitted more than unsupported allegations" to support his claim); *Kelley v. City of Albuquerque*, 375 F. Supp. 2d 1183,1203 n.7 (D.N.M. 2004) (citing *Conaway v. Smith*, 853 F.2d 789, 794 (10th Cir. 1988)) (noting that to overcome the defendant's motion for summary judgment on the basis of qualified immunity, the "plaintiff must do more than rest on [his or her] own speculation or pleadings").

The Denver Defendants assert that the summary judgment evidence fails to demonstrate that each Denver Defendant violated a constitutional right, and even if they did violate any of Plaintiff's constitutional rights, those rights were not clearly established at the time of the alleged violations.

### 1.    Fourth Amendment Search and Seizure

The Denver Defendants argue that they did not cause Plaintiff's catheterization and

thus the search and seizure claim against them fails. *Motion* [#239] at 9.  "A plaintiff must allege factual causation—i.e. 'but for' causation—in order to state a claim under § 1983." *Scott v. Hern*, 216 F.3d 897, 911 (10th Cir. 2000).  The circumstances in *Scott v. Hern* are similar to the circumstances in the present case.  There, the plaintiff "filed suit against individuals who participated in his involuntary commitment to a mental institution, alleging a dizzying array of violations of 42 U.S.C. § 1983 and related violations of state law." *Id.* at 904.  The plaintiff asserted that a law enforcement officer, Officer Idler, prepared a false report concerning the plaintiff's mental state and gave the report to a private physician, Dr. Hern, "knowing it 'could bolster' Hern's efforts to have [the plaintiff] committed." *Id.* at 911. The plaintiff argued that Officer Idler's report was the direct and proximate cause of his commitment.  *Id.*  The Tenth Circuit determined that, even if Officer Idler "included false statements in his report and then gave that report to Hern knowing it would be used to seek [the plaintiff's] involuntary commitment, it [was] simply not the case that, but for Idler's preparation and provision of the report, [the plaintiff] would not have been committed." *Id.* Because Dr. Hern's independent medical judgment determined that the plaintiff was in need of involuntary commitment, the plaintiff could not demonstrate a § 1983 violation by Officer Idler even if Officer Idler's report was sufficient by itself to support the plaintiff's involuntary commitment.  *Id.*

The same situation is present here.  Even accepting Plaintiff's sworn testimony that Defendant Black urged the Medical Defendants to obtain a urine sample from Plaintiff,[13] the

---

[13]  The Court notes that Plaintiff's evidence supports that only Defendant Black made the request for a urine sample to the Medical Defendants.  *See, e.g.*, *Depo. of Pl.* [#274-2] at 79 (testifying that Defendant Black told Defendant Swan that "We need a urine sample.").  There is no such evidence with respect to Defendants Lopez and O'Neill.  Individual liability pursuant to § 1983 "must be based on personal involvement in the alleged constitutional violation." *Foote v. Spiegel*, 118 F.3d 1416, 1425, (10th Cir. 1997); (citing *Grimsley v. MacKay*, 93 F.3d 676, 679 (10th Cir. 1996)); *Bennett v. Passic*, 545 F.2d 1260, 1262-63 (10th Cir. 1976) ("Personal participation is an

Medical Defendants have provided uncontradicted evidence that a urine sample was medically necessary and that they would have taken a urine sample regardless of Defendant Black's request. *Aff. of Swan* [#241-3] ¶¶ 5-9. Under these circumstances, Plaintiff cannot as a matter of law prove that any of the Denver Defendants were the but-for cause of the involuntary catheterization. *See Scott*, 216 F.3d at 911. There is no genuine dispute as to any material fact and Defendants are entitled to judgement as a matter of law. Fed. R. Civ. Pro. 56(a).

Accordingly, the Court **recommends** that the judgment enter in favor of the Denver Defendants on Plaintiff's Claim One based on unreasonable search and seizure in violation of the Fourth Amendment.

## 2.     First Amendment Retaliation

Plaintiff asserts that the Denver Defendants unconstitutionally retaliated against him because of his attempt to exercise his First Amendment rights. *See Order* [#133] at 19 n.9. Plaintiff asserts that he had a constitutional right "to speak to a supervisor and an agent from internal affairs to report police brutality and misconduct at the Hospital . . . ." *Response* [#276] at 13.

Retaliatory acts under § 1983 include acts that would otherwise be permissible if they were not conducted in retaliation. *Mimics, Inc. v. Village of Angel Fire*, 394 F.3d 836, 847 (10th Cir. 2005) (citing *DeLoach v. Bevers*, 922 F.2d 618, 620 (10th Cir. 1990)); *Smith*

---

essential allegation in a Section 1983 claim." (citations omitted)). A defendant is personally involved in an alleged constitutional violation only if there is an "affirmative link" between his conduct and the described violation. *Stidham v. Peace Officer Stds. & Training*, 265 F.3d 1144, 1156 (10th Cir. 2001). The Court further notes that the Denver Defendants' restraint of Plaintiff during the procedure does not alter this analysis. *Sullivan v. Bornemann*, 384 F.3d 372 (7th Cir. 2004) (holding that the brief restraint by law enforcement of a detainee during a procedure required by medical personnel for clearance was not unconstitutional). Plaintiff's claim of excessive force during the restraint is addressed below.

*v. Maschner*, 899 F.2d 940, 948 (10th Cir. 1990)).  To survive summary judgment, a plaintiff must provide evidence:

> (1) that plaintiff was engaged in constitutionally protected activity; (2) that the defendant's actions caused the plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and (3) that the defendant's adverse action was substantially motivated as a response to the plaintiff's exercise of constitutionally protected conduct.

*Mimics*, 394 F.3d at 847 (citing *Worrell v. Henry*, 219 F.3d 1197, 1212 (10th Cir. 2000) (quotations omitted)).  The Denver Defendants primarily argue that Plaintiff lacks sufficient evidence to meet the causation element of this claim.

The causation issue in this case is similar to the issue addressed by the Tenth Circuit Court of Appeals in *McBeth v. Himes*, 598 F.3d 708, 717-20 (10th Cir. 2010).  That case arose out of an investigation by the Arapahoe County Sheriff's Office and the Colorado Department of Human Services, Division of Child Care ("DHS"), which resulted in the plaintiff surrendering her license to run a daycare facility in Colorado.  *Id.* at 712. Among other claims, the plaintiff asserted a First Amendment retaliation claim against Detective Jeffrey Himes ("Himes") and against DHS employees Terry Santi ("Santi") and Kathi Wagoner ("Wagoner").  *Id.* at 716.  In its analysis of the defendants' motion for summary judgment, the district court granted qualified immunity to the DHS employees on all claims and to Mr. Himes on all claims except for retaliation.  *Id.*  Mr. Himes argued on appeal that the plaintiff failed to provide sufficient evidence of causation.  *Id.* at 717.  In connection with this element, the plaintiff had argued that, "because [the plaintiff] consulted with an attorney, Himes informed DHS that she was not cooperating with the investigation, which led to her injury when DHS threatened her with suspension of her daycare license and coerced her into agreeing to relinquish her license."  *Id.*  Mr. Himes contended that "his alleged complaint to DHS could not have caused DHS to seek suspension of [the plaintiff]'s

daycare license because DHS already possessed the legal authority to suspend [the plaintiff]'s license and would have done so even in the absence of his complaint." *Id.* Similarly, in the instant case, the Denver Defendants argue that the uncontroverted evidence demonstrates that the Medical Defendants had the authority to order and conduct the catheterization of Plaintiff and would have done so regardless of anything the Denver Defendants did or did not say. *Motion* [#239] at 9-11; *Aff. of Swan* [#239-5].

On appeal of *McBeth*, the Tenth Circuit Court of Appeals embarked on an extended discussion of *Hartman v. Moore*, 547 U.S. 250 (2006), in which the United States Supreme Court held that "the causation required in a First Amendment retaliatory prosecution claim connecting a retaliatory motive to the adverse action taken by the defendant is 'but-for causation, without which the adverse action would not have been taken.'" *Id.* (quoting *Hartman*, 547 U.S. at 260).

> We agree with Himes that the *Hartman* framework applies to these facts. As in *Hartman*, the retaliation claim against Himes is really for "successful retaliatory inducement" of DHS to seek suspension of McBeth's license. *Hartman*, 547 U.S. at 262. This case thus presents the same difficulties in tracing the chain of causation as *Hartman* did, as the defendant who allegedly acted with the retaliatory animus is not the same individual as the one who caused Plaintiff's injury. It would therefore be just as difficult to establish that DHS would not have sought suspension of McBeth's license in the absence of Himes' complaint as it is to determine whether charges would have been brought in the absence of a retaliatory motive on the part of the investigator. *Id.* at 260 ("If there is a finding that retaliation was not the but-for cause of the [adverse action], the claim fails for lack of causal connection between unconstitutional motive and resulting harm, despite proof of some retaliatory animus in the official's mind.").
>
> . . .
>
> We therefore conclude that McBeth must allege and prove that the state officials lacked cause to seek suspension of her license. She has not done so. . . . DHS had ample bases to seek the suspension of McBeth's license regardless of any complaint made by Himes.
>
> As the Court stated in *Hartman*, the "connection" that "bridge[s] the gap"

-30-

between the official with the retaliatory animus and the official who takes the adverse action against the plaintiff "is the absence of probable cause." *Hartman*, 547 U.S. at 263. Here, Santi and Wagoner had reasons to seek the suspension of McBeth's license; accordingly, McBeth cannot prove the causation element of her retaliation claim. Himes is therefore entitled to summary judgment on the ground of qualified immunity on this claim, because he did not violate any clearly established right possessed by McBeth, even if he called DHS with the motive to retaliate against McBeth.

The circumstances at issue here are materially similar. According to the summary judgment evidence, "construed in the light most favorable" to Plaintiff, *Eaton v. Meneley*, 379 F.3d 949, 955 (10th Cir. 2004), Defendant Black requested a urine analysis from the Medical Defendants, who subsequently forcefully catheterized Plaintiff. *Depo. of Pl.* [#274-2] at 79. Even accepting Plaintiff's sworn testimony that Defendant Black urged the Medical Defendants to obtain a urine sample from Plaintiff, the Medical Defendants have provided uncontradicted evidence that a urine sample was medically necessary and that they would have taken a urine sample regardless of Defendant Black's request. Under these circumstances, Plaintiff cannot as a matter of law prove that any of the Denver Defendants were the but-for cause of the involuntary catheterization. There is no genuine dispute as to any material fact and Defendants are entitled to judgment as a matter of law. Fed. R. Civ. Pro. 56(a).

Accordingly, the Court **recommends** that judgment enter in favor of the Denver Defendants on Plaintiff's Claim Four based on retaliation in violation of the First Amendment.

### 3.    Fourth Amendment Invasion of Privacy

Despite the parties' apparent confusion, Plaintiff's invasion of privacy claim presently survives as only a Fourth Amendment constitutional claim and only on the basis of the alleged "intentional exposure of [Plaintiff's] privates to the public and unauthorized

disclosure of private medical information to the public as well as the invasion of his bodily integrity by forcefully catheterizing him and recklessly exposing his body in the nude."[14] *Order* [#133] at 19 n.9; *Recommendation* [#114] at 20 (quoting *Response* [#86] at 29). In other words, while Plaintiff's other Fourth Amendment claim involves the search and seizure of his urine, this Fourth Amendment claim involves the exposure of his body and medical information.

"[T]he federal constitution . . . protects against public disclosure [of] only highly personal matters representing the most intimate aspects of human affairs." *Brokers' Choice of Am., Inc.*, 757 F.3d at 1149 (citation omitted) (discussing invasion of privacy in the context of a substantive due process Fourteenth Amendment claim). Plaintiff for the most part presents argument regarding the privacy interests of non-incarcerated, non-detained persons. *See Response* [#272] at 4-16. "The expectations of privacy of an individual taken into policy custody 'necessarily [are] of a diminished scope.'" *Maryland v. King*, 133 S. Ct. 1958, 1978 (2013) (quoting *Bell v. Wolfish*, 441 U.S. 520, 557 (1979)). For example, "[a] search of a detainee's person . . . may involve a relatively extensive exploration, including requiring at least some detainees to lift their genitals or cough in a squatting position." *Maryland*, 133 S. Ct. at 1978 (internal citation and quotation marks omitted). "Once an individual has been arrested on probable cause for a dangerous offense that may require detention before trial, . . . his or her expectations of privacy and freedom from police scrutiny are reduced." *Id.* Plaintiff was a pretrial detainee at the time of the events underlying this lawsuit.[15]

---

[14]   For example, Plaintiff raises a state law invasion-of-privacy claim and argues that the blood draw was also a violation of his rights. *See Response* [#272] at 4. Neither of these issues are a part of the present litigation. *See Order* [#133] at 19 n.9; *Order* [#316] at 3-4.

[15]   The Court discusses Plaintiff's status further below. *See infra* § III.C.4.

The circumstances in the instant case are similar to those discussed in *Sullivan v. Bornemann*, 384 F.3d 372 (7th Cir. 2004). In that case, medical personnel ordered a urine analysis on an arrested individual who was presented for medical attention by the arresting officers. *Sullivan*, 384 F.3d at 376-77. The medical personnel asked the law enforcement officials to help them briefly restrain the detainee during the catheterization procedure. *Id.* at 377. The *Sullivan* court noted that the detainee "had no right to refuse treatment once he was arrested and transported to the emergency room." *Id.* at 378. As in Plaintiff's case, the results of the *Sullivan* detainee's urine analysis, which demonstrated the presence of both alcohol and marijuana, were never used in criminal proceedings against the detainee. *Id.* at 377. With this background in mind, the *Sullivan* court held:

> While the Fourth Amendment does protect Sullivan's expectations of privacy, the law provides that this applies only to "legitimate expectations that *in certain places and at certain times* [an individual] has the right to be let alone." *Winston v. Lee*, 470 U.S. 753, 758 (citation and internal quotation marks omitted) (emphasis added). It is clear that Sullivan's expectations of privacy diminished substantially once he was arrested for disorderly conduct (an arrest that he has not challenged on probable cause or other grounds), found to have drug paraphernalia on his person, and recorded a high alcohol level on the breathalyzer test. At that point, the officers were entitled to seek medical attention.
>
> There is no rule to the effect that law enforcement officials are constitutionally prohibited from briefly restraining a detainee at the direction of qualified medical personnel, with the purpose of minimizing injury to the detainee. Under the circumstances here, which we have already recounted, the officers' actions were entirely reasonable. As the district court correctly noted in its discussion of the qualified immunity defense, a holding to the contrary would place law enforcement officers in the impossible position of having to second-guess the medical judgments of emergency room physicians.

The *Sullivan* court therefore held that the officers did not violate the plaintiff's Fourth Amendment rights. *Id.* (citing *Florida v. Jimeno*, 500 U.S. 248, 250 297 (1991) (noting that the "touchstone of the Fourth Amendment is reasonableness")).

Here, there is no evidence that anyone except for Defendant Swan, Defendant

Englund, and the Denver Defendants who helped restrain Plaintiff *may* have seen Plaintiff's genitals.  While Plaintiff presents evidence that Defendant Black saw his genitals, *see Depo. of Pl.* [#274-2] at 81 (testifying that Defendant Black struck Plaintiff in the groin/testicles), the Court notes that there is no direct evidence that Defendants Lopez or O'Neill saw Plaintiff while naked.  *See Cook*, 773 F. Supp. 2d at 1007 (noting that the plaintiff failed to present evidence that the restraining officers viewed her unclothed body).  *But see Safford Unified Sch. No. 1 v. Redding*, 557 U.S. 364, 374 (2009) (stating that the Court does not define the consequences of a Fourth Amendment strip search in terms of "who was looking and how much was seen").  Further, there is no evidence that the officers restrained Plaintiff for any longer than was necessary to perform the procedure.  As in *Cook v. Olathe Medical Center, Inc.*, 773 F. Supp. 2d at 1007, "[t]he uncontroverted evidence establishes that any removal or rearranging of clothing was done to provide medical treatment and/or obtain blood and urine samples."  In sum, Plaintiff has presented insufficient evidence that any constitutional right was violated by the alleged exposure of his genitals here.

Insofar as Plaintiff argues that his Fourth Amendment rights were violated based on the unauthorized disclosure of private medical information to the public, he has failed to present any evidence of what private medical information was made available, who made it available, to whom it was made available, or when this was done.  To the extent Plaintiff asserts this claim against the Denver Defendants, there is no evidence that the Denver Defendants themselves caused the unauthorized disclosure of private medical information to anyone.  There is no genuine dispute as to any material fact and Defendants are entitled to judgment as a matter of law.  Fed. R. Civ. Pro. 56(a).

Accordingly, the Court **recommends** that judgment enter in favor of the Denver

Defendants on Plaintiff's Claim Five based on invasion of privacy in violation of the Fourth Amendment.

### 4.    Section 1983 Excessive Force Claim

With respect to this claim, Plaintiff admitted in his deposition that during the catheterization he was combative with hospital personnel. *Depo. of Pl.* [#274-2] at 80 ("I grabbed my penis, and I covered it with my hands so that they couldn't do anything to me."), 81 ("I remember giving them a fight and preventing them from doing it for a little bit of time . . . ."), 82 ("I remember trying to pull my knees up, trying to stop them . . . . I was trying to turn my hips to face the bottom of the . . . actual bed so that they couldn't do it . . . ."). In response, Plaintiff asserts that Defendant Lopez choked him and reached around with his hand and yanked Plaintiff's head back. *Depo. of Pl.* [#274-2] at 81. Plaintiff states that Defendant Lopez continued to choke him "until [Plaintiff] almost lost consciousness" or "might have lost consciousness." *Id.*; *see also id.* at 90. Plaintiff further testifies that Defendant Black pulled his arm and struck him in the groin and testicles. *Id.* He states that this caused him "extreme pain" and that he felt like he "just wanted to throw up." *Id.*; *see also id.* at 90-91. With respect to Defendant O'Neill, Plaintiff states that he was "isolating and holding my legs down and that an unidentified individual, who may have been Defendant O'Neill, pulled Plaintiff's legs, cranked his ankle, and dug an elbow into the side of his calf and knee. *Id.* at 82; *see also id.* at 88-89.

The Denver Defendants did not seek summary judgment on this claim in the Motion. [#239] at 7 n.2. Regardless, even though only the Medical Defendants sought summary judgment on this claim, Plaintiff responded in a global fashion which included both the Denver Defendants and the Medical Defendants. *See Response* [#276] at 10-11. In the Reply, the Denver Defendants acknowledge that they did not originally move for summary

judgment with respect to this claim, but they urge the Court to enter summary judgment in their favor anyway. [#296] at 14-16. The Court declines to consider the Denver Defendants' delayed request, *see Planned Parenthood of Rocky Mountains Servs., Corp. v. Owens*, 287 F.3d 910, 927 n.18 (10th Cir. 2002) (stating that an argument raised for the first time in a reply brief need not be considered), but notes that the primary argument raised by the Denver Defendants in the Reply [#296] has been addressed by the Court in its discussion of *Scott v. Harris* above. *See supra* § III.A.

The Denver Defendants did argue in the Motion that summary judgment should be entered in favor of Defendant Lopez on this claim (as well as all others) based on lack of personal participation. *Motion* [#239] at 7-8. Defendant Lopez provides his own Affidavit [#239-11] and the Affidavit [#239-4] of Defendant O'Neill in support of his assertion that he was not present at the hospital when the events underlying this lawsuit occurred. He thus argues that he could not have used excessive force (or committed any other constitutional violation) against Plaintiff. *Motion* [#239] at 7-8. However, Plaintiff provides evidence to the contrary from his deposition: "After viewing a photo that was identified to me as Jay Lopez, I believe that was . . . definitely the person that was wiping blood off my face and attempting to cover up the blood that was all over my face. . . . Also the person that choked me when they conducted the forced catheterization because he was standing right on the side and I believe he was the person that surprised me and choked me." *Depo. of Pl.* [#274-2] at 65. This evidence creates a genuine issue of material fact which may not be resolved on summary judgment. *See Anderson*, 477 U.S. at 248.

The Court sua sponte raises one additional issue with respect to this claim. Plaintiff initially asserted his excessive force claim pursuant to the Fourth and Fourteenth Amendments but did not explain how each amendment applies to his case. *See*

*Recommendation* [#114] at 8.  The Tenth Circuit has provided explicit guidance as to the appropriate amendment to apply to an excessive force claim.  *See Porro v. Barnes*, 624 F.3d 1322, 1325-26 (10th Cir. 2010).   Excessive force claims may be maintained only under the Fourth, Fifth, Eighth, and Fourteenth Amendments. *Id.* at 1325.  The appropriate amendment and accompanying legal test depends "on where the defendant finds himself in the criminal justice system." *Id.*  The Fourth Amendment applies to incidents "leading up to and including an arrest of a citizen previously at liberty." *Id.*  The Eighth Amendment applies to "prisoners already convicted of a crime who claim that their punishments involve excessive force . . . ." *Id.* (emphasis in original).  The Fifth or Fourteenth Amendments apply to the period between initial seizure and post-conviction punishment. *Id.*  The United States Supreme Court has stated that the Fourteenth Amendment governs any excessive force claim asserted by a "pretrial detainee," who is a person who has had a "judicial determination of probable cause as a prerequisite to [the] extended restraint of [his] liberty following arrest." *Estate of Booker v. Gomez*, 745 F.3d 405, 419 (10th Cir. 2014) (quoting *Bell v. Wolfish*, 441 U.S. 520, 536 (1979)).  The Tenth Circuit Court of Appeals has clarified that "[o]n the other hand, we have held that the Fourth Amendment, not the Fourteenth, governs excessive force claims arising from "treatment of [an] arrestee detained *without a warrant*" and "*prior to* any probably cause hearing." *Estate of Booker*, 745 F.3d at 419 (quoting *Austin v. Hamilton*, 945 F.2d 1155, 1160 (10th Cir. 1991) (adding emphasis), *abrogated on other grounds by Johnson v. Jones*, 515 U.S. 304 (1995)).  "The choice of amendment matters [on] [e]xcessive force claims . . . . [E]ach [amendment] carries with it a very different legal test." *Porro*, 624 F.3d at 1325-26.

When the Court evaluated Defendants' Motions to Dismiss, it noted that it was "not clear from the Amended Complaint whether Plaintiff was under arrest or merely

involuntarily detained." *Recommendation* [#114] at 5 n.1. Thus, at that time, it was unclear whether Plaintiff's claim of excessive force should be analyzed under the Fourth or the Fourteenth Amendment.   From the summary judgment evidence, it is now clear that Plaintiff was arrested before being transported to St. Anthony's. *Depo. of Pl.* [#274-2] at 11.   He was arrested pursuant to "a total of six active warrants for his arrest" relating to charges of "Failure to Appear for Trespassing out of Arvada, three counts of Violation of a Restraining Order Domestic Violence, 2nd Degree Burglary Domestic Violence, two counts of Violation of Bond Conditions, Intimidation of a Witness Domestic Violence, Stalking Domestic Violence, and Harassment Domestic Violence." *Ex. 3, Denver Police Dep't Inter-Dep't Correspondence* [#239-3] at 1.   Thus, Plaintiff's "complaint is about arbitrary governmental action, taken without due process, while he [was] detained awaiting trial." *Porro*, 624 F.3d at 1326.

The Court need not adhere to the legal labels attached by a plaintiff to his claims. *See Castro v. United States*, 450 U.S. 375, 381 (2003) (noting that it is appropriate for federal courts to ignore the legal labels attached to a pro se party's claims "to create a better correspondence between the substance of [the party's claims] and [the] underlying legal basis").   In this case, the events underlying this claim occurred after Plaintiff was arrested pursuant to multiple warrants and before he was convicted. *Depo. of Pl.* [#274-2] at 11.   Based on the evidence provided, there is no question that Plaintiff's claim regarding excessive force falls under, and only under, the Fourteenth Amendment. *See Porro*, 624 F.3d at 1325-26; *Estate of Booker*, 745 F.3d at 420 (stating that the Fourth Amendment "says nothing about the treatment owed to a detainee *after* he or she has been lawfully seized pursuant to probable cause" (emphasis in original)).   Accordingly, Plaintiff's

excessive force claim should be analyzed under the Fourteenth Amendment.[16]  *Estate of Booker*, 745 F.3d at 421 ("[W]e hold the Fourteenth Amendment standard governs excessive force claims arising from post-arrest and pre-conviction treatment if the arrestee has been taken into custody pursuant to a warrant supported by probable cause.").[17]

Accordingly, the Court further **recommends** that the Denver Defendants' Motion for Summary Judgment on Plaintiff's Fourteenth Amendment excessive force claim be **denied**.

### 5.    § 1983 Conspiracy

Plaintiff asserts a § 1983 conspiracy claim against the Denver Defendants and

---

[16]  In his evaluation of the Motions to Dismiss and the Recommendation, the District Judge sua sponte held:

> [P]laintiff's attempt to invoke the protections of the Fourteenth Amendment in addition to those offered by the more specific constitutional guarantees implicated by each of those claims is inappropriate.  Where a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims.  Plaintiff's claims for unreasonable search and seizure, excessive force, retaliation for exercise of First Amendment rights, and conspiracy to violate civil rights all implicate rights protected by specific constitutional guarantees, as clearly recognized in his articulation of the claims themselves.  To the extent plaintiff seeks to invoke also the Fourteenth Amendment, those aspects of those claims are properly dismissed.

*Order* [#133] at 9-10 (internal citations and quotation marks omitted).  To be clear, the Court is *not* here reinstating the substantive Fourteenth Amendment claim dismissed by the District Judge, which was a second claim brought *in addition to* the Fourth Amendment claim based on the same conduct.  Rather, the Court is creating a better correspondence between the substance of Plaintiff's claims and the appropriate underlying legal basis by transforming the Fourth Amendment claim into the more suitable due process Fourteenth Amendment claim.  *See Castro*, 450 U.S. at 381.

[17]  The Court notes it is immaterial that Plaintiff was also taken into custody for two reasons for which there were no warrants: "Investigation of Burglary" and "Violation of Restraining Order." *Ex. 3, Denver Police Dep't Inter-Dep't Correspondence* [#239-3] at 1.  In *Estate of Booker v. Gomez*, the plaintiff "was arrested pursuant to a warrant based on probable cause for failing to appear at a court proceeding in conjunction with drug charges." 745 F.3d at 420.  "Although there was no probable cause determination on the drug charges, there was a probable cause determination for [the plaintiff's] failure to appear." *Id.* at 420-21.  This is all that was necessary to bring the plaintiff's excessive force claim within the Fourteenth Amendment's protections. *Id.* at 421.

Defendants Englund and Swan in connection with each of his constitutional claims under the First, Fourth, and Fourteenth Amendments.  The Tenth Circuit has stated that "a conspiracy to deprive a plaintiff of a constitutional or federally protected right under the color of state law" is actionable.  *Snell v. Tunnell*, 920 F.2d 673, 701 (10th Cir. 1990). However, in order to succeed on a conspiracy claim under 42 U.S.C. § 1983, "a plaintiff must plead and prove not only a conspiracy, but also an actual deprivation of rights; pleading and proof of one without the other will be insufficient."  *Id.*  Further, "[w]hile a deprivation of a constitutional right is essential to proceed under a § 1983 claim, proof of an agreement to deprive will often require examination of conduct occurring prior to the deprivation."  *Id.* at 701-02.  To establish the existence of a conspiracy, a plaintiff seeking redress must show that there was a "single plan, the essential nature and general scope of which [was] known to each person who is to be held responsible for its consequences." *Id.* (internal citations omitted).

Here, the Court has found that Plaintiff has failed to provide sufficient evidence that he may be entitled to relief on his First and Fourth Amendment claims.  With respect to his Fourteenth Amendment excessive force claim, Plaintiff has provided no evidence that the Denver Defendants conspired together to use excessive force against him.  While they may have worked together to restrain Plaintiff during the catheterization procedure, there is no evidence that they entered into an agreement prior to the catheterization to collectively use excessive force on Plaintiff while they did so.  Rather, Plaintiff's evidence at best merely supports a finding that each independently chose to engage in potentially excessively forceful actions.  There is no genuine dispute as to any material fact and Defendants are entitled to judgment as a matter of law.  Fed. R. Civ. Pro. 56(a).

Accordingly, the Court **recommends** that judgment enter in favor of the Denver Defendants on Plaintiff's Claim Seven for § 1983 conspiracy in violation of the First, Fourth, and Fourteenth Amendments.

## IV.  Conclusion

For the foregoing reasons, the Court respectfully **RECOMMENDS** as follows:

(1)     that the Denver Defendants' Partial Motion for Summary Judgment [#239] be **GRANTED in part and DENIED in part**;[18]

(2)     that Defendants Swan and Centura's Motion for Summary Judgment [#241] be **GRANTED** as to all claims; and

(3)     that the St. Anthony Defendants' Motion for Summary Judgment [#243] be **GRANTED** as to all claims.

IT IS **ORDERED** that pursuant to Fed. R. Civ. P. 72, the parties shall have fourteen (14) days after service of this Recommendation to serve and file any written objections in order to obtain reconsideration by the District Judge to whom this case is assigned.  A party's failure to serve and file specific, written objections waives de novo review of the Recommendation by the District Judge, Fed. R. Civ. P.  72(b); *Thomas v. Arn*, 474 U.S. 140, 147-48 (1985), and also waives appellate review of both factual and legal questions. *Makin v. Colo. Dep't of Corr.*, 183 F.3d 1205, 1210 (10th Cir. 1999); *Talley v. Hesse*, 91 F.3d 1411, 1412-13 (10th Cir. 1996).  A party's objections to this Recommendation must be both timely and specific to preserve an issue for de novo review by the District Court or for appellate review.  *United States v. One Parcel of Real Prop.*, 73 F.3d 1057, 1060 (10th

---

[18]  If this Recommendation is adopted in full, the only remaining claim will be Claim Two against the Denver Defendants in their individual capacities based on violation of the Fourteenth Amendment (excessive force).

Cir. 1996).

Dated April 7, 2015, at Denver, Colorado.

BY THE COURT:

Kristen L.  Mix
United States Magistrate Judge